# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 18-3905-GW(GJSx) | Date | August 22, 2019 |
|---|---|---|---|
| Title | *John Dlugolecki v. Seth Poppel, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Miranda L. Algorri | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Kenneth P. Norwick, by telephone | Miles L. Prince |

**PROCEEDINGS:    DEFENDANT AMERICAN BROADCASTING COMPANIES, INC.'S MOTION FOR SUMMARY JUDGMENT [72]**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. Defendant's Motion is DENIED.

The Court sets a status conference for September 30, 2019 at 8:30 a.m. The post mediation status conference set for September 26, 2019 is taken off-calendar.

|  | : | 15 |
|---|---|---|
| Initials of Preparer | JG | |

*__Dlugolecki v. Poppel, et al.__*, Case No. 2:18-CV-03905-GW-(GJSx)
Tentative Ruling on Motion for Summary Judgment


This case – insofar as the instant motion is concerned – involves the allegedly unauthorized use, by American Broadcasting Companies, Inc. ("Defendant"), in various broadcasts of several photos of Meghan Markle ("the Markle Photos") taken by John Dlugolecki ("Plaintiff") while Markle was a student at Immaculate Heart Middle and High School ("Immaculate Heart") in the 1990s.  *See* Second Amended Complaint for Copyright in Infringement and Other Claims, Docket No. 53.  Defendant allegedly obtained them, by way of a third party or parties, from Immaculate Heart yearbooks.  Plaintiff asserted claims for willful copyright infringement and willful contributory copyright infringement against Defendant.  Defendant now moves for summary judgment, arguing that it is entitled to summary judgment because it may take advantage of the "fair use" defense found in the Copyright Act and because its use of the Markle Photos was *de minimis*.

## A. __Summary Judgment Standard__

Summary judgment shall be granted when a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment should be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Parth v. Pomona Valley Hosp. Med. Ctr.*, 630 F.3d 794, 798-99 (9th Cir. 2010).

To prevail at summary judgment, a moving party who also bears the burden of persuasion on the issue in question "must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (omitting internal quotation marks).

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

(internal citations and quotation marks omitted).   In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party.   *See id.* at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *see also Hrdlicka v. Reniff*, 631 F.3d 1044 (9th Cir. 2011); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (*en banc*); *Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005).

### B.  Relevant Undisputed Facts[1]

On November 27, 2017, Buckingham Palace announced that Markle, an American actress with mixed racial heritage, had become engaged to Prince Harry, who was then fifth in line to the British throne.   *See* Reply to Plaintiff's Separate Statement of Disputed Fact ("RP"), Docket No. 89-1, ¶ 5.   This event was treated as major news in the United States, where it was covered by most media outlets.   *See id.*   After the engagement was announced, Defendant used the Markle Photos in connection with several segments of news shows.   *See id.* ¶ 6.   Defendant used the Markle Photos in conjunction with a plethora of other images and video, along with voiceover providing a biographical context, in connection with editorial content discussing what Markle was like in high school, how her former teachers and classmates viewed her, how her engagement to Prince Harry affected students at her high school, and how her background is likely to affect and influence the royal family in light of her engagement to Prince Harry.   *See id.* ¶ 15.

On November 27, 2017, Defendant's "Good Morning America" show broadcast a segment discussing Markle's background in connection with questions about how she will fit into the royal family.   *See id.* ¶ 7.   The segment, which was part of a 2-hour broadcast, included a 4 second, 25 frame-use of a headshot of Markle taken for Immaculate Heart's yearbook when she was a senior (the "Senior Headshot").   *See id.*   No other Markle Photo

---

[1] This factual background section is based upon the *undisputed* facts, which includes facts that are both expressly undisputed and facts that have not been properly disputed in accordance with Central District of California Local Rule 56-3.   *See* C.D. Cal. L.R. 56-3 (indicating that court "may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are . . . controverted by declaration or other written evidence filed in opposition to the motion").   In other words, simply stating that a proposed uncontroverted fact is "disputed," without citation to evidence supporting such a dispute, is insufficient to actually identify a dispute of fact.   In addition, on a summary judgment motion, the Court does not consider evidence submitted for the first time in connection with a Reply brief.

was used during this program. *See id.*

On November 27, 2017, on the late-night news program "Nightline," Defendant displayed a cropped version of a photo of Markle (the "Senior Genesian" photo) in her high school drama club – the Genesian Society – for 2 seconds, 21 frames during a segment that included a discussion of Markle's "humble beginnings" in contrast to her engagement to a member of the British royal family and how unusual her background is in the history of the British royal family. *See id.* ¶ 9.

On November 28, 2017, in connection with another piece on Markle, her engagement, and how she will fit into the royal family, Defendant used a photo of Markle in the Genesian Society in the course of discussing her high school and her participation in high school and college drama productions. *See id.* ¶ 8. This image (the "Junior Genesian" photo) was used for 1 second, 28 frames, during a 2-hour Good Morning America broadcast. *See id.* No other Markle Photo was used during this program. *See id.*

On December 1, 2017, Defendant broadcast a longer segment on Markle during its Good Morning America program. *See id.* ¶ 9. This segment was taken in whole from a "20/20" episode that would be broadcast that same evening, and was described as a "sneak peek" of that later 20/20 broadcast. *See id.* The segment used a cropped version of the Junior Genesian photo for 2 seconds, 4 frames, in connection with a discussion of Markle's childhood and education and an interview of the teacher who was pictured on the left side of the photo, next to Markle. *See id.* For 2 seconds, 1 frame, it used a cropped version of a composite of the 1999 senior class from Immaculate Heart, a photo that hangs on the wall at the school (the "Composite" photo). For 3 seconds, 2 frames, the segment displayed a close-up of Markle's yearbook image that appears in the Composite – in other words, her Senior Headshot. For 2 seconds, 24 frames, it showed another yearbook photo of Markle (the "Junior Headshot" photo). *See id.* The displays of the Composite, the close-up of the Senior Headshot that was part of the Composite, and the Junior Headshot were all made in connection with an interview with 3 current Immaculate Heart students, discussing how those students react to, and have been affected by, the Composite, and their general reaction to the news of Markle's engagement. *See id.*

That same Good Morning America "sneak peek" segment also displayed the Senior Headshot for 4 seconds, 13 frames in connection with a teacher's discussion of how, by

graduation, Markle was determined to "make it big." *See id.* Finally, it included a 30-second preview of an upcoming 20/20 broadcast, including a 23-frame use of the Senior Headshot in connection with a reference to Markle's "amazing backstory." *See id.*

The December 1, 2017, airing of Nightline was also taken from the 20/20 broadcast. *See id.* ¶ 11. Again, it discussed Markle's history and how she would fit into the royal family. *See id.* It used the Senior Headshot for 1 second, 2 frames, as part of a preview for the full segment, referring to the fact that Markle's "road to royalty" was not always a fairy tale. *See id.* Like the Good Morning America broadcast earlier that day, and in the context of the same interviews mentioned above in connection with that broadcast, it too used the Junior Genesian photo (for 3 seconds, 7 frames), the Composite (for 26 frames), and the Senior Headshot as it appeared in the Composite (for 1 second, 8 frames). *See id.* The segment also discussed how Markle's background would be likely to affect her role in the royal family. *See id.*

On 20/20, on December 1, 2017, Defendant aired "The American Princess," an hour-long production devoted entirely to Markle's personal history and how it would impact her as a part of the British royal family in light of her days-old engagement. *See id.* ¶ 12. In the same context as on the airing of Good Morning America earlier that day – that is, in connection with an interview with the pictured teacher and with current students – the production displayed the Junior Genesian photo (for 3 seconds, 5 frames), the Composite (for 2 seconds, 8 frames), and the Senior Headshot (for 3 seconds, 4 frames). *See id.* In addition, the program used cropped versions of the Senior Genesian (for 6 seconds, 7 frames) and Junior Genesian (for 3 seconds, 7 frames) in conjunction with an interview with a girl who had been bullied, and whom Markle had defended. *See id.*

In sum, the 6 broadcasts on which Defendant displayed the Markle Photos included 8 hours of broadcast time, using the aforementioned photos for a total of 49 seconds, 21 frames (or 55 seconds, 12 frames[2]). *See id.* ¶ 13. Those broadcasts also included dozens of other images of Markle, as well as other stories. *See id.*

---

[2] As noted *supra*, Footnote 1, the Court generally does not consider new evidence submitted in connection with a summary judgment motion's reply brief where that evidence is an attempt to bolster a moving party's case and/or to fill in gaps in the motion revealed by the Opposition. Here, however, Defendant has clarified information that, if anything, could only *hurt* its defense(s). In that regard, therefore, the Court is inclined to accept this larger time calculation for accuracy purposes.

In addition to the foregoing productions, Defendant broadcast 2 previews of the 20/20 show, both of which displayed the Senior Headshot for approximately 1 second. *See id.* Defendant also used two unspecified images on video previews posted on Twitter. *See id.*

The yearbooks containing the Markle Photos were published without any copyright notices attached to any image nor to the yearbooks in question. *See id.* ¶ 2. Plaintiff first registered a copyright in one of those photos – Markle's senior year high school portrait – in December 2017. *See id.* ¶ 3. He registered a copyright in additional images of Markle in April 2018. *See id.* ¶ 4.

### C. Relevant Disputed Facts

There is apparently a dispute as to whether Defendant modified or altered certain of the Markle Photos in its display of them. *See, e.g.*, RP ¶¶ 7-9, 13.

### D. Analysis of Plaintiff's Summary Judgment Motion

#### 1. Burden and Other Preliminary Notes

Because this is Defendant's motion, Plaintiff's ability to prove a *prima facie* case of copyright infringement is not at issue. The only questions are whether Defendant may prevail on two defenses it has raised in its motion. *See, e.g.*, *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012) ("This affirmative defense presumes that unauthorized copying has occurred, and is instead aimed at whether the defendant's use was fair."). As defenses to infringement, Defendant bears the burden of establishing fair use and/or that any use was *de minimis*. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *Monge*, 688 F.3d at 1170; *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007); *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1150 (9th Cir. 1986) ("*Moral Majority*"); *Morris v. Young*, 925 F.Supp.2d 1078, 1084 (C.D. Cal. 2013); *Rosen v. R & R Auction Co.*, No. CV 15-07950-BRO (JPRx), 2016 WL 7626443, *7 (C.D. Cal. Aug. 31, 2016).

"Fair use is a mixed question of law and fact, but it is well established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute." *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008); *see also Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013) ("Where no material, historical facts are at issue and the parties dispute only the ultimate conclusions

to be drawn from those facts, we may draw those conclusions without usurping the function of the jury."); *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1120 (9th Cir. 1997) ("'If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court *may* conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work.'") (emphasis added) (quoting *Moral Majority*, 108 F.3d at 1150); *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) ("Fair use is a mixed question of law and fact that *may* be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion."). But because it bears the burden of proof on these defenses, under normal circumstances Defendant would have to show that the evidence supporting those defenses "is so powerful that no reasonable jury would be free to disbelieve it." *Shakur*, 514 F.3d at 890; *see also Campbell*, 510 U.S. at 594 ("[A] silent record on an important factor bearing on fair use disentitled the proponent of the defense . . . to summary judgment."); *Monge*, 688 F.3d at 1191 n.7 ("Summary judgment on fair use grounds is appropriate only if it is the only reasonable conclusion a trier of fact could reach in the case.") (M. Smith, J., dissenting); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright (Matthew Bender, Rev. Ed. 2009) ("Nimmer"), § 13.05[A][4], at 13-199 (predicting that "defense summary judgments will continue in the fair use arena even after *Campbell*, but those defendants will be challenged to develop an appropriate record").

Although, consistent with the foregoing, there are unquestionably published decisions making clear that summary judgment may be appropriate with regard to fair use (in either a copyright holder's or a defendant's favor), *see, e.g.*, *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986), it is not uncommon for courts to determine that the issue is simply too close to call and should be submitted to the factfinder. *See, e.g.*, *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 529 (9th Cir. 1984); *Bell v. Moawad Grp., LLC*, 326 F.Supp.3d 918, 929 (D. Ariz. 2018) (denying summary judgment based on a perceived "factual dispute" about whether social media posts were for a commercial purpose and where "the remaining considerations [did] not clearly point in either direction," such that court could not "conclude as a matter of law that a reasonable jury could reach only one conclusion"); *Morris*, 925 F.Supp.2d at 1088-89 (concluding that summary judgment was inappropriate because "triable issue of fact" existed as to "whether the work is

transformative").  The important point to recognize is that a district court *may* conclude that summary judgment is warranted with respect to fair use – there is no apparent rule that it *has* to decide the issue on summary judgment.

At the outset, it must be noted that the analysis on this motion is made more difficult by the fact that there are multiple images at issue and multiple airings on Defendant's television programs, yet the parties have addressed the issues as if the defenses may all be adjudged singularly in connection with all images and all airings.

## 2.  Fair Use

"[T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, [or] news reporting . . . is not an infringement of copyright."  17 U.S.C. § 107. In other words, "[p]rotection of copyrighted works is not absolute.  'The fair use defense permits the use of copyrighted works without the copyright owner's consent under certain situations.'"  *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 739 (9th Cir. 2019), *petition for cert. filed* (U.S. June 13, 2019) (No. 18-1540) (quoting *Perfect 10*, 508 F.3d at 1163).  "The defense encourages and allows the development of new ideas that build on earlier ones." *Perfect 10*, 508 F.3d at 1163; *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("The Copyright Act was intended to promote creativity, thereby benefitting the artist and the public alike.  To preserve the potential future use of artistic works for purposes of teaching, research, criticism, and news reporting, Congress created the fair use exception.").  It "permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  *Campbell*, 510 U.S. at 577; *see also Seltzer*, 725 F.3d at 1175; Nimmer, § 13.05, at 13-155 ("In determining whether given conduct constitutes copyright infringement, the courts have long recognized that certain acts of copying are defensible as 'fair use.'").

"With minimal guidance or elucidation, Congress set forth four factors for courts to consider when determining whether the use of a copyrighted work is a 'fair use'."  *VHT*, 918 F.3d at 739.  Those factors, recited in Section 107, are as follows:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the

copyrighted work.

17 U.S.C. § 107; *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985) ("The factors enumerated in the section are not meant to be exclusive . . . ."). "Over time, there has been a shift in analytical emphasis in the fair use factors, in large part due to several key Supreme Court cases.  The relative importance of factor one – 'the purpose and character' of the use – and factor four – 'the effect of the use upon the potential market' – has dominated the case law."  *Monge*, 688 F.3d at 1171.

Nevertheless, the four factors "must all be explored, and all the results evaluated together, in light of the purposes of copyright."  *Seltzer*, 725 F.3d at 1175; *see also Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) ("To determine whether a work constitutes fair use, we engage in a case-by-case analysis and a flexible balancing of relevant factors.  The factors are 'to be explored, and the results weighed together, in light of the purposes of copyright.'  Depending on the particular facts, some factors may weigh more heavily than others."); *see also* Nimmer, § 13.05[A][1][a], at 13-163 ("[E]ven if the defendant's use falls within the first fair use factor, the result is merely to tilt towards, but not to necessitate a finding of fair use.  The first factor must still be balanced against the other factors listed in Section 107.").  "Given license to apply the[] four [listed fair use] factors flexibly and to consider them in their totality, courts have been bedeviled by the fair use inquiry."  *VHT*, 918 F.3d at 739; *see also* Nimmer, § 13.05[A], at 13-159 (recognizing both that Section 107 "gives no guidance as to the relative weight to be ascribed to each of the listed factors" and that "each of the factors is defined in only the most general terms, so that courts are left with almost complete discretion in determining whether any given factor is present in any particular case").  It "has been called 'the most troublesome [doctrine] in the whole law of copyright' and commentators have criticized the factors as 'billowing white goo.'"  VHT, 918 F.3d at 739 (quoting *Monge*, 688 F.3d at 1170-71); *see also Monge*, 688 F.3d at 1183 ("Following the statute, we consider each of the four factors and put them in the judicial blender to find the appropriate balance."); *Time, Inc. v. Bernard Geis Assocs.*, 293 F.Supp. 130, 144 (S.D.N.Y. 1968) (commenting that the "doctrine is entirely equitable and is so flexible as virtually to defy definition").

The Court's assessment of the factors as presented on this motion (one that may or may not be shared by a factfinder, at a later date) is as follows:

a.  <u>Purpose and Character; Commercial Nature</u>

Under Section 107, the first factor a court is to consider in assessing the fair use defense is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  "The Supreme Court has stated that the 'central purpose' of this factor is to see 'whether and to what extent the new work is transformative.'"  *Seltzer*, 725 F.3d at 1175-76 (quoting *Campbell*, 510 U.S. at 579).  Thus, "[t]he animating purpose of the first factor" is to determine "whether the new work merely supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'"  *VHT*, 918 F.3d at 740 (quoting *Campbell*, 510 U.S. at 579) (omitting internal quotation marks); *see also Seltzer*, 725 F.3d at 1176 ("If . . . the secondary use adds value to the original – if the quoted matter is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.") (quoting Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)) (omitting internal quotation marks); *Disney Enters., Inc. v. VidAngel, Inc.*, 371 F.Supp.3d 708, 720 (C.D. Cal. 2019) ("[T]he 'purpose and character' factor considers whether the work's purpose was for or not-for-profit and 'to what extent the new work is transformative' and does not simply 'supplant' the original work.") (quoting *Mattel*, 353 F.3d at 800).  "'[T]he more transformative the new work, the less will be the significance of the other factors.'"  *Seltzer*, 725 F.3d at 1176 (quoting *Campbell*, 510 U.S. at 579).  Still, "just because a given use qualifies as 'transformative' does not even mean that defendants prevail under the first factor, much less that they prevail altogether on the fair use defense."  Nimmer, § 13.05[A][1][b], at 13-172.

"'A use is considered transformative only where a defendant changes a plaintiff's copyrighted work or uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation.'"  *Perfect 10*, 508 F.3d at 1165 (quoting *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006)).  "[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function."  *Id.*  In contrast, "[i]n the typical 'non-transformative' case, the use

is one which makes no alteration to the *expressive content or message* of the original work." *Seltzer*, 725 F.3d at 1177. "A mere difference in purpose . . . 'does not necessarily create new aesthetics or a new work that alters the first work.'" *Morris*, 925 F.Supp.2d at 1084 (quoting *Monge*, 688 F.3d at 1176) (omitting internal quotation marks).

Crucially, simply because "news reporting" is specifically mentioned in the preamble to Section 107, this does not give any unauthorized use of copyrighted material in that specific context a special "leg up" in the "fair use" analysis. *See Monge*, 688 F.3d at 1173 ("The 'fact that an article arguably is news and therefore a productive use is simply one factor in a fair use analysis.' In other words, fair use has bounds even in news reporting, and no per se 'public interest' exception exists.") (quoting *Harper & Row*, 471 U.S. at 561); *id.* at 1172 (noting that, in *Harper & Row*, "the Court did not give a fair use free pass to news reporting on public figures"); *Fitzgerald v. CBS Broad., Inc.*, 491 F.Supp.2d 177, 184 (D. Mass. 2007) (noting that fact that use falls into one of the categories expressly mentioned in Section 107 "does not by itself create a presumption of fair use"); *see also Harper & Row*, 471 U.S. at 557 ("The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the book."); *id.* at 561 ("The fact that an article arguably is 'news' and therefore a productive use is simply one factor in a fair use analysis."). In other words, "[a] claim that the material reproduced is 'newsworthy' cannot necessarily validate a fair use defense, as the facts can be copied, without the need to reproduce the expression." Nimmer, § 13.05[A][1][c], at 13-175 n.112. "Because publication of photographic evidence that constitutes proof of a newsworthy event is not automatically fair use," a court must still examine the degree of transformative use. *Monge*, 688 F.3d at 1174.[3]

Here, the Court has little difficulty agreeing with Defendant that its use of the Markle Photos was, to at least some degree, transformative. *See Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) ("[W]hat is important here is that plaintiffs' photographs were originally intended to appear in modeling portfolios, not in the newspaper; . . . by using the photographs in conjunction with editorial commentary, [the newspaper] did not merely 'supersede[] the objects of the original creation[s],' but instead

---

[3] Defendant's reliance, in its briefing, on federal district court authority from New York that appears to be, to at least some degree, inconsistent with the principles set forth in the paragraph above, is misguided. *See* Docket No. 72-1, at 15:14-19.

used the works for 'a further purpose,' giving them a new 'meaning, or message'") (quoting *Campbell*, 510 U.S. at 579); *Weinberg v. Dirty World, LLC*, No. CV 16-9179-GW (PJWx), 2017 WL 5665023, *9 (C.D. Cal. July 27, 2017) (finding use of photo still taken from reality television show to be transformative where, "[r]ather than using the photo to merely identify Plaintiff or his wife, as [the wife had] on her Facebook profile page, or glorify Plaintiff and his wife's lifestyle, as the creator of [the television show] did, the entire Post uses the Video Image as part of a direct critique on Plaintiff's wife's appearance, her status as a model, her husband, and her relationship with her husband"); *see also Fitzgerald*, 491 F.Supp.2d at 185 (describing *Nunez* as a situation "where the photo in question was recontextualized from one market – studio fashion imagery – to another – daily news – and from aesthetic use to documentary use"); *cf. VHT*, 918 F.3d at 742 (noting that search engine did not "fundamentally change the[] original purpose" of the plaintiff's photographs – "to artfully depict rooms and properties" – and displayed entire image, not a thumbnail, such that the new image did not serve a "different function" and preserved the photos' "inherent character"); *Seltzer*, 725 F.3d at 1176 (finding use transformative where, though the original was "prominent, it remains only a component of what is essentially a street-art focused music video about religion and especially about Christianity").

The First Circuit's decision in *Nunez* is perhaps particularly enlightening with respect to this factor. In *Nunez*, a newspaper published photos of a woman, taken from her modeling portfolio, when there was an issue of public debate over whether a person taking the type of photos in question was appropriate to serve as Miss Universe Puerto Rico. In other words, limited-distribution photos originally created for one purpose found their way into the public eye because of their relationship to an issue of public concern. In at least that respect, there is little to distinguish this situation from that. *See Perfect 10*, 508 F.3d at 1165 (citing *Nunez* as a case holding that "republication of photos taken for a modeling portfolio in a newspaper was transformative because the photos served to inform, as well as entertain"); *see also Kelly*, 336 F.3d at 819 ("By putting a copy of the photograph in the newspaper, the work [in *Nunez*] was transformed into news, creating a new meaning or purpose for the work.").

Beyond the fact that the photos – like those in *Nunez* – were used in the course of "news" (or at least "news-like") television programming, Defendant characterizes the

nature of that transformative use as the photos' employment in the course of making a "newsworthy biographical photographic reference."  Docket No. 72-1, at 10:7-8; *see also SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1276, 1278 (9th Cir. 2013) (concluding that alleged infringer had used video clip "for its biographical significance" and "as a biographical anchor," and had thereby "imbued it with new meaning" and "put the clip to its own transformative ends"); *Monge*, 688 F.3d at 1174 ("Minor changes, such as placing 'voice-overs' on video clips, do not 'necessarily transform a work.' Arrangement of a work in a photo montage, however, can be transformative where copyrighted material is incorporated into other material.") (quoting *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628-29 (9th Cir. 2003)).  Certainly, that took the photos out of their original meaning/purpose as, in Defendant's telling, "personal and family keepsakes and memorabilia," Docket No. 72-1, at 10:11-13, or "decorat[ing] mantles, trad[ing] with friends, or otherwise serv[ing] as memorabilia of high school," *id.* at 14:8-10.

At the same time, it is true that the Ninth Circuit distinguished *Nunez* in *Monge*, and in a way that could be seen as applicable here as well (and consistent with Nimmer's observation, quoted earlier, that "the facts can be copied, without the need to reproduce the expression"):

> Although *Nunez* also involved news reporting, the similarities end there.  The controversy there was whether the salacious photos themselves were befitting a 'Miss Universe Puerto Rico,' and whether she should retain her title.  In contrast, the controversy here has little to do with photos; instead, the photos here depict the couple's clandestine wedding.  The photos were not even necessary to prove that controverted fact – the marriage certificate, which is a matter of public record, may have sufficed to inform the public that the couple kept their marriage a secret for two years.

*Monge*, 688 F.3d at 1175.  So too here.  The photos of Markle from Immaculate Heart were not – with perhaps one or two exceptions (both as to photos and programs in which the photos aired)[4] – *the story* here.  Nevertheless, even if this Court were to follow *Monge*'s

---

[4] For instance, the Junior Genesian photo was displayed in the November 28, 2017, airing of Good Morning America in conjunction with a discussion of her participation in her high school drama productions.  *See* RP ¶ 8.  Similarly, the Composite photo was displayed in the December 1, 2017, airing of Good Morning America in connection with a story that discussed, among other things, how current Immaculate Heart students react to, and are affected by, the presence of the Composite.  *See id.* ¶ 9.

reasoning, it does not believe that the point being made in the above-quoted portion of that decision relates most-appropriately to the issue of transformative use. Instead, it would appear to this Court to relate most-directly to the factor concerning amount and substantiality of use. This Court believes – especially when considering the concept discussed in the preceding paragraph – that Defendant's uses of the Markle Photos were transformative. Nevertheless, the Court does not view Defendant's uses as being *considerably*, or *overwhelmingly*, transformative. *See, e.g.*, *Monge*, 688 F.3d at 1176 ("[W]holesale copying sprinkled with written commentary" is "at best minimally transformative."); *Morris*, 925 F.Supp.2d at 1085 (noting that merely "adding tint, slightly cropping, and changing the medium" of photograph did not support conclusion of transformation).

Although the Court concludes that Defendant's uses of the Markle Photos were, to some extent, transformative, the first factor also asks that the Court take into account the commercial nature of those uses. Thus, a court cannot ignore that an allegedly-infringing use is "for commercial purposes." *VHT*, 918 F.3d at 742. In this regard, however, it is important to note that the question is "not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000). The Ninth Circuit has, as recently as 2017, continued to take the position that where a use is "commercial" in nature, it is "presumptively unfair." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017) (quoting *Leadsinger*, 510 U.S. at 530).[5] Perhaps anticipating that it had nothing favorable to add on this point, Defendant entirely ignores the "commercial nature" aspect

---

[5] *Disney Enterprises* is inconsistent with other Ninth Circuit decisions on this last point (or at least its brief treatment of the issue does not appear to tell the whole story). *See SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278-79 (9th Cir. 2013) ("[B]ecause Dodger's use of the clip is transformative, the fact that *Jersey Boys* is a commercial production is of little significance."); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1172 (9th Cir. 2012) (reading *Campbell* as debunking the notion that commercial use is presumptively unfair, supporting the view that such a fact "tends to weigh against a finding of fair use," but "that is all," such that "commercial use may tip the scale toward market harm, but like the other factors, it 'may be addressed only through a sensitive balancing of interests'"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) ("The Supreme Court has rejected the proposition that a commercial use of the copyrighted material ends the inquiry under this factor."); *id.* ("The more transformative the new work, the less important the other factors, including commercialism, become."); Nimmer, § 13.05[A][1][c], at 13-174 ("[C]ommerciality merely inclines against fair use, without giving rise to presumptive significance.").

of the first Section 107 fair use factor in its opening brief.[6]

Even if monetary gain was not Defendant's "sole motive" (though that in and of itself may be a debatable point), there is no question that Defendant stood to profit from its use of the Markle Photos. *See Mattel*, 353 F.3d at 803 ("[A]s the Supreme Court noted in *Campbell*, even works involving comment and criticism 'are generally conducted for profit in this country.'") (quoting *Campbell*, 510 U.S. at 584); *Nunez*, 235 F.3d at 22 ("[A]ctivities such as news reporting . . . 'are generally conducted for profit in this country.'") (quoting *Campbell*, 510 U.S. at 584); *see also* Nimmer, § 13.05[A][1][c], at 13-174.4 - 175 ("Even if the defendant's purpose in copying is news reporting – one of the characteristically fair purposes set forth in the preamble to Section 107 – its profit motivation may negate the fairness of its use under this factor.").

An argument could be made – at least with respect to some of the photos and some of the broadcasts – that use of the Markle Photos was only "incidentally "commercial." *See Seltzer*, 725 F3d at 1178 (finding that use of drawing in background video as part of "undoubtedly commercial" concert was "only incidentally commercial" where "band never used it to market the concert, CDs, or merchandise"); *Kelly*, 336 F.3d at 818 ("[W]hile such use of Kelly's images was commercial, it was more incidental and less exploitative in nature than more traditional types of commercial use.  Arriba was neither using Kelly's images to directly promote its web site nor trying to profit by selling Kelly's images."). However, there is evidence of at least some of the photos being used in promotional clips and "sneak peaks" for later, more in-depth, presentations about Markle.  *See* RP ¶¶ 9, 13; *Nunez*, 235 F.3d at 22 (concluding that "more than mere reproduction for a profitable use" was involved where photographs "were used in part to create an enticing lead page that would prompt readers to purchase the newspaper," such that photograph was used "not only as an ordinary part of a profit-making venture, but with emphasis in an attempt to increase [newspaper's] revenue"); *cf. Monge*, 688 F.3d at 1178 ("Maya's headlines bragged about its exclusive photo spread of never before seen images.").[7]

---

[6] Indeed, in its Reply brief Defendant addresses it only to make the argument – consistent with the case law cited *supra*, Footnote 5 – that the existence of a commercial purpose does not render a use presumptively unfair.  *See* Docket No. 89, at 13:17-26.

[7] The Court acknowledges that there are at least some obvious similarities between this case and the Eastern District of California's non-precedential decision in *Calkins v. Playboy Enterprises Int'l, Inc.*, 561 F.Supp.2d 1136 (E.D. Cal. 2008), which resulted in a summary judgment fair-use determination.  Among

In the end, on this factor the Court is left with indisputably – though not significantly – transformative uses of the photos, but uses that – at least in most cases – were not necessary for the story being told, and ones that had a definite commercial purpose or association. On these facts, the Court cannot conclude – for purposes of this motion – that the first Section 107 factor strongly favors Defendant. Instead, it appears to be a factor that the Court feels is perhaps most-appropriately described as in equipoise.

### b. Nature of the Work

The second fair use factor listed in Section 107 is "the nature of the copyrighted work." 17 U.S.C. § 107(2). "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row*, 471 U.S. at 563. This is because "'[w]orks that are creative in nature are closer to the core of intended copyright protection than are more fact-based works.'" *VHT*, 918 F.3d at 743 (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001)) (omitting internal quotation marks); *see also Seltzer*, 725 F.3d at 1178 (noting that creative work "merit[ed] strong protection under this factor"); *SOFA Entm't*, 709 F.3d at 1279 ("An alleged infringer will have a more difficult time establishing fair use when he appropriates a work of [creative] nature."); *Nimmer*, § 13.05[A][2][a], at 13-182 (commenting that, under the "nature of the copyrighted work" factor, "the more creative a work, the more protection it should be accorded from copying; correlatively, the more informational or functional the plaintiff's work, the broader should be the scope of the fair use defense"). But where the copyrighted materials have already been published, the factor operates "with less force" in favor of the copyright-holder. *See VHT*, 918 F.3d at 744.[8]

In the end, however, this factor has not been considerably influential in the case law. The Ninth Circuit has expressly recognized as much: "As we have recognized in the past, 'this [nature of the copyrighted work] factor typically has not been terribly significant

---

other things, both cases involved unauthorized uses of high school senior portrait photographs. One of the distinctions this Court observes between the two cases – that ultimately cause the Court to conclude the case is not persuasive, in addition to not being precedential – involves examination of the varying degrees of commercial use of the photos in question. *See id.* at 1141. In addition, the *Calkins* court based its reasoning, at least in part, on its conclusion that the photograph in question was not published, and pre-dated *Monge*'s discussion of the necessity of use. *See id.* at 1142-43.

[8] Plaintiff makes a brief stab at arguing that the Markle Photos were previously unpublished. *See* Docket No. 85, at 10:4-25. This is clearly not true – they were yearbook photos and/or a composite photo that hangs on the wall at Immaculate Heart. Simply because the photos may not have been the subject of widespread distribution does not mean that they were unpublished within the meaning of fair use analysis.

in the overall fair use balancing.'" *Mattel*, 353 F.3d at 803 (quoting *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997)); *see also* Nimmer, § 13.05[A][2][a], at 13-183 ("[T]his second factor more typically recedes into insignificance in the greater fair use calculus.").

"In [*Perfect 10* and *Kelly*, the Ninth Circuit] held that photographers' images are creative, especially when they are created for public viewing." *VHT*, 918 F.3d at 743; *see also Monge*, 688 F.3d at 1177 ("Photos are generally viewed as creative, aesthetic expressions of a scene or image and have long been the subject of copyright."); *Perfect 10*, 508 F.3d at 1167 n.9; *Kelly*, 336 F.3d at 820 ("Photographs that are meant to be viewed by the public for informative and aesthetic purposes, such as Kelly's, are generally creative in nature."); *Morris*, 925 F.Supp.2d at 1086 ("The Ninth Circuit has recognized that photography is, by nature, at least minimally creative."). Here, Defendant admits that the Markle Photos have "some creative elements," while still arguing that the photos "are more in the nature of fact of fact-based works, depicting Markle and her peers as they appeared at a certain point in time, using formulaic poses." Docket No. 72-1, at 16:17-19.

The Court sees no need to make any fine distinctions between creative and factual works here. It is willing to accept the view that there is some measure of creativity in the photos. But that creativity is minimal. The photos are ordinary yearbook-style photos and class photos. *See Nunez*, 235 F.3d at 23 ("Nunez's pictures could be categorized as either factual or creative: certainly, photography is an art form that requires a significant amount of skill; however, the photographs were not artistic representations designed primarily to express Nunez's ideas, emotions, or feelings, but instead a publicity attempt to highlight Giraud's abilities as a potential model."). Certainly, there is no evidence in the record supporting the view that the photos Plaintiff took of Markle were any more "creative" than the ones he took of any other student(s) at Immaculate Heart (or any other school). *Cf. Fitzgerald*, 491 F.Supp.2d at 188 (finding that photo of individual being transferred from police barracks after arrest was not creative because the photographer's "getting the scoop was not a creative process").

While Defendant seeks to set this minimal creativity against what it views as its "highly transformative" uses of the photos, *see* Docket No. 72-1, at 17:20-22, the Court (as explained above) does not share Defendant's view of the extent or depth of its

transformative uses.  Nevertheless, the minimal creativity involved in the Markle Photos (which were not unpublished) means that Plaintiff would only benefit slightly, at most, via application of this factor.

c.   <u>Amount and Substantiality</u>

Section 107's third-listed factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This third factor "looks to the quantitative amount and qualitative value of the original work used in relation to the defendant's justification for the use."  *SOFA Entm't*, 709 F.3d at 1279.

> "While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use."  However, the extent of permissible copying varies with the purpose and character of the use.  If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her.

*Kelly*, 336 F.3d at 820-21 (quoting *Worldwide Church*, 227 F.3d at 1118).  Thus, "[t]he focus of the inquiry must be whether verbatim copying is necessary to Defendant's . . . purpose."  *Weinberg*, 2017 WL 5665023, at *11; *see also Seltzer*, 725 F.3d at 1178 (observing that "most" of drawing had been copied, "both quantitatively and qualitatively," but because it was "not meaningfully divisible," this factor "will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use").  "The inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used."  *Monge*, 688 F.3d at 1179.

Defendant admits that it used the entirety of the two headshots of Markle, but less than the whole with respect to the two "Genesian" photos and the Composite photo.  In all respects, it argues that it used only what was needed of the photos to accomplish its biographical purpose.

On the one hand, Defendant has case law that supports the view that, in the context of photographs, taking less than the whole often would not serve, or would be inconsistent with, the purpose of the use.  *See Nunez*, 235 F.3d at 22 (concluding that "the pictures were the story," meaning that "[i]t would have been much more difficult to explain the controversy without reproducing the photographs"); *Fitzgerald*, 491 F.Supp.2d at 188 ("This factor weighs less when considering a photograph – where all or most of the work

17

often must be used in order to preserve any meaning at all – than a work such as a text or musical composition.").  On the other hand, there are cases suggesting that only slight cropping of photographs indicates that the unauthorized user has truly used "the heart" of a photograph, indicating that the factor should be resolved in favor of the copyright-holder. *See Monge*, 688 F.3d at 1178 (concluding that "minimal cropping . . . demonstrates that the 'heart' of each individual copyrighted picture was published"); *Brewer*, 749 F.2d at 529 (observing that fact that "only a small portion of the photograph was cropped off" supported the jury's verdict of no fair use); *Morris*, 925 F.Supp.2d at 1087 (concluding that factor weighed against finding of fair use where most or all of photograph was used, adding "nothing more than shading and a new medium"); *see also Fitzgerald*, 491 F.Supp.2d at 188 ("[S]uperficial editing or cropping does not impact the Court's consideration.").

Perhaps even more troubling for Defendant is the view that – at least where, unlike *Nunez*, the photo is *not* itself the story – Defendant could have accomplished its news-reporting/biographical purposes without using *any* of Plaintiff's photographs.  Here, for instance (and with the possible exception of the uses noted *supra*, Footnote 4), the biographical pieces were largely about Markle's background and what she was like in her younger years.  Even to the extent those broadcasts mentioned that Markle attended Immaculate Heart, there was still no *need* to reproduce Plaintiff's photos in order to make that point.

This was the view that the Ninth Circuit appears to have adopted in *Monge*. Specifically, that decision reasoned that "[w]hile we do not discredit Maya's legitimate role as a news gatherer, its reporting purpose could have been served through publication of the couple's marriage certificate or other sources rather than copyrighted photos." *Monge*, 688 F.3d at 1179.  "Maya used far more than was necessary to corroborate its story – all three wedding images and three post-wedding photos." *Id.*; *see also id.* at 1175 ("The photos were not even necessary to prove th[e] controverted [marriage] – the marriage certificate, which is a matter of public record, may have sufficed to inform the public that the couple kept their marriage a secret for two years."); *id.* at 1170 ("Maya did not publish other supporting evidence such as a marriage certificate, choosing instead to rely solely on the sensational photos.").  Of course, this is an approach that would seemingly not be without its fair share of worthy criticism – it is virtually always the case that something

other the copyright-holder's work could be used, even where the resulting use is transformative. Nevertheless, it is a published Ninth Circuit decision that makes this point (repeatedly), and this Court cannot ignore it.

This factor, in particular, could vary depending on the photograph in question and the broadcast in question. *See* Footnote 4, *supra*. However, as noted previously, Defendant has taken a "blunderbuss" approach to this motion – all or nothing. Having failed to present a more "fine-toothed" case for why it should prevail on a fair use defense with respect to certain of the photographs/broadcasts, the Court will not make that case for Defendant. This factor, at least on this motion, does not appear to demonstrably favor Defendant.

### d. Effect on Potential Market or Value

The final factor listed in Section 107 is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "The fourth factor requires courts to consider the secondary use's impact on the market for the original work and the market for derivative works, including if the defendant's actions became 'unrestricted and widespread.'" *SOFA Entm't*, 709 F.3d at 1280 (quoting *Campbell*, 510 U.S. at 590); *see also Harper & Row*, 471 U.S. at 569 ("Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented.") (omitting internal quotation marks); *VHT*, 918 F.3d at 744 ("To defeat a fair use defense, 'one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work.'"); *Nunez*, 235 F.3d at 24-25 ("[W]e examine the effect of this publication on the market, and we also determine whether wide-scale reproduction of professional photographs in newspapers (for similar purposes) would in general affect the market for such photography."); Nimmer, § 13.05[A][4], at 13-195 (noting that the fourth factor "poses the issue of whether unrestricted and widespread conduct of the sort engaged in by the defendant (whether in fact engaged in by the defendant or by others) would result in a substantially adverse impact on the potential market for, or value of, the plaintiff's present work"). Some decisions have called this factor the "most important factor." *Harper & Row*, 471 U.S. at 566 ("This last factor is undoubtedly the single most important element of fair use."); *Fisher*, 794 F.2d at 437; *Weinberg*, 2017 WL 5665023, at *13.

Some courts have also tied the analysis of this factor to that performed in

connection with the first factor.  For instance, in *Kelly* the Ninth Circuit instructed that "[a] transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work."  *Kelly*, 336 F.3d at 821; *see also Perfect 10*, 508 F.3d at 1168 (concluding that a presumption of market harm where an intended use of an image is for commercial gain "does not arise when a work is transformative because 'market substitution is at least less certain, and market harm may not be so readily inferred'") (quoting *Campbell*, 510 U.S. at 591).

Defendant briefly contends that it "did not profit directly" from use of the photos and that this should be taken into account in connection with this factor as well.  Docket No. 72-1, at 18:22-23.  It argues that it did not profit directly because the advertising that appears on the programs in question is not tied directly to any photo use, or even any subject covered by the programs, but is instead booked well-in-advance.  These arguments deal with issues that overlap with the "commercial" designation discussed above in connection with the first Section 107 factor.  In any event, any requirement of a "direct profit" connection in assessing this fourth factor is nonsensical in the context of the television business model.  This Court is not the first to make that observation.  *See Fitzgerald*, 491 F.Supp.2d at 187 (rejecting argument that no commercial impact existed for television news broadcast's use of photo "because the advertisements that ran during the broadcasts had been purchased months in advance, and were unaffected by the decision to use the photo" because "[t]he decision to use the photo . . . affected ratings and commercial revenues *in the future*, as all real-time broadcasts do" and was "aimed at increasing the station's viewership – and therefore ratings and revenue – in the long run"); *cf. Weinberg*, 2017 WL 5665023, at *9 ("[T]he more eyes on a page, the more likely future advertiser[s] are to invest in a given website.").

Defendant also argues that there is no evidence that Plaintiff had ever licensed any of the Markle Photos or any intention of doing so in the future.  It is at least true that Plaintiff did not register any copyrights in any of the Markle Photos until December 2017. *See* RP ¶ 3.  However, it should come as no surprise to our tabloid-fueled and celebrity-obsessed – and, more particularly, much of the world's British royal family-obsessed – culture that a market for early-life photos of Markle would materialize upon her identification as a future member of that family (even if she was already a television actress

of modest success prior to that time). *See Monge*, 688 F.3d at 1181 ("[W]e note there is little doubt that an actual market exists for the photos."); *cf. Nunez*, 235 F.3d at 25 ("[T]he potential market for the photographs might also include the sale to newspapers for just this purpose: illustrating controversy."). What Defendant seemingly conveniently ignores is the speed with which it ran its Markle-related programming once her engagement to Prince Harry was announced on November 27, 2017. Defendant's argument countenances the proposition that Plaintiff would near-instantaneously cultivate a market between the time of that announcement and Defendant's programming, and his failure to do so indicates there is no such market. But Defendant's use virtually proves the market. *See, e.g.*, *Fitzgerald*, 491 F.Supp.2d at 189 ("CBS's use of the photographs is paradigmatic of the only market the photographs could reasonably have: licensing to media outfits. . . . The market for media licenses for these photographs clearly exists."). It is also not irrational to conclude that once Defendant had "scooped" the press on publishing the Markle Photos, any continuing potential licensing market for those photos would have been immediately, and perhaps terminally, negatively impacted:

> Although the photos were unpublished until Maya printed them for commercial gain, after the publication of Issue 633, the bottom literally dropped out of the market – neither Maya nor anybody else is likely to purchase these pictures from the couple. And it is obvious that any licensing value, to the extent the couple could find a willing licensee, is severely diminished.

*Monge*, 688 F.3d at 1182; *see also Morris*, 925 F.Supp.2d at 1088 (concluding that use "threaten[ed] the market for the Subject Photograph by eroding its uniqueness"); *see also Brewer*, 749 F.2d at 529 ("[T]he jury could have found that the value of the photograph as a novelty item suffered from overexposure.").

In the end, the lack of a convincing showing on this point rebounds back onto Defendant, who is the moving party, and who bears the burden of persuasion on the fair use defense. *See Campbell*, 510 U.S. at 594 ("[A] silent record on an important factor bearing on fair use disentitled the proponent of the defense . . . to summary judgment."); *Monge*, 688 F.3d at 1181 (criticizing defendant for failing to offer any evidence of relevant market or lack of market harm from publication other than broad, unsubstantiated statements in its brief). The factor favors Plaintiff.

e.   Conclusion re Section 107 Factors

On this motion, based upon the evidentiary showing and arguments made, the Court cannot conclude that any of the four factors clearly favor Defendant.  Defendant bears the burden with regard to the defense.  As such, the motion is denied insofar as fair use is concerned.

3.   *De Minimis* Use

"For an unauthorized use of a copyrighted work to be actionable, the use must be significant enough to constitute infringement."  *Newton v. Diamond*, 388 F.3d 1189, 1192-93 (9th Cir. 2004).  "This means that even where the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial."  *Id.* at 1193.  This notion, in essence, is the wellspring of the "*de minimis*" doctrine in copyright infringement law.  *See id.*  "As a rule, a taking is considered *de minimis* only if it is so meager and fragmentary that the average audience would not recognize the appropriation."  *Fisher*, 794 F.2d at 434 n.2.  "To say that a use is *de minimis* because no audience would recognize the appropriation is thus to say that the use is not sufficiently significant."  *Newton*, 388 F.3d at 1193.[9]

Here, Defendant has admitted using the entirety of two headshots of Markle.  While the lack of general divisibility of photographs may aid Defendant's case under one or more of the fair use factors, it seemingly makes it equally difficult for it to prevail on a *de minimis* defense, especially at the summary judgment stage.  The amount of time Defendant uses the Markle Photos in its broadcasts, as compared to other material, will not alter that result on this motion.

**E.  Conclusion**

For the foregoing reasons, the Court denies Defendant's motion.  It therefore has no need to consider Plaintiff's request for relief pursuant to Federal Rule of Civil Procedure 56(d).  The Court also will not take up Plaintiff's final-sentence invitation to have it grant summary judgment *in Plaintiff's favor*, apparently *sua sponte*.  The issues raised by way of this motion will be for a factfinder to assess.

---

[9] To the extent Defendant relies on any authority from the federal courts of appeal in connection with this defense, it relies on out-of-Circuit law.  This Court applies the defense as examined by the Ninth Circuit. Defendant's failure to explain in its motion how it satisfies those standards ensures its defeat on this motion insofar as the *de minimis* defense is concerned.